IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONNA LENOCKER,

                  Plaintiff,                                                  CV-07-1742-ST

      v.                                                                          FINDINGS AND
                                                                                    RECOMMENDATION
MICHAEL J. ASTRUE, Commissioner of Social
Security,

                Defendant.          

STEWART, Magistrate Judge:

      Plaintiff, Donna Lenocker ("Lenocker"), challenges the Commissioner's decision denying

her application for disability insurance benefits under Title II of the Social Security Act.  The court

has jurisdiction under 42 USC § 405(g).  For the following reasons, the Commissioner's decision

should be affirmed.

      The court reviews the Commissioner's decision to ensure that proper legal standards were

applied and the findings are supported by substantial evidence in the record.  42 USC § 405(g);

*Tommasetti v. Astrue,* 533 F3d 1035, 1039 (9th Cir 2008).  The administrative law judge ("ALJ")

applied the five-step sequential disability determination process set forth in 20 CFR § 404.1520. *Bowen v. Yuckert*, 482 US 137, 140 (1987). Lenocker argues the ALJ failed to identify all of her severe impairments, improperly assessed her residual functional capacity ("RFC"), and relied on erroneous testimony from the vocational expert ("VE"). Lenocker contends these deficiencies led the ALJ to erroneously conclude she retains the capacity to perform her past relevant work.

## FINDINGS

## I.    Severe Impairments

Lenocker contends the ALJ erred at step two by failing to identify degenerative disc disease when specifying her severe impairments. At step two, the ALJ must determine whether the claimant has any combination of impairments which significantly limits her ability to do basic work activities. 20 CFR § 404.1520(c). If the claimant does not have any such impairment or combination of impairments, the ALJ must find her not disabled and need not continue the disability determination process beyond step two. 20 CFR § 404.1520(a)(4)(ii).

In the present case, the ALJ resolved step two in Lenocker's favor, finding she had impairments which surmounted the step-two hurdle. Admin. R. 20- 21. The ALJ properly continued the decision-making process until reaching a determination at step four. Any error in designating specific impairments as severe did not prejudice Lenocker at step two. *See Burch v. Barnhart*, 400 F3d 676, 682 (9th Cir 2005) (Any error in omitting an impairment from the severe impairments identified at step two was harmless where step two was resolved in claimant's favor); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007) (failure to list an impairment as severe at step two harmless error where ALJ considered the functional limitations posed by that impairment later in the decision).

Lenocker's argument may be construed as a challenge to the ALJ's RFC assessment.  Once a claimant has surmounted step two by showing any severe impairment, the ALJ must consider the functional limitations imposed by all medically determinable impairments, including those found non-severe at step two, in the remaining steps of the decision.  20 CFR § 404.1523.  Accordingly, the ALJ was required to evaluate the evidence of functional limitations from degenerative disc disease in assessing Lenocker's RFC.

Lenocker did not allege back pain or any functional limitations from degenerative disc disease in her application, disability reports, or function reports.  Admin. R. 97, 100, 106, 122-23, 148, 149, 153, 165-73, 175-81.  Lenocker testified she stopped working at the alleged onset of disability in August 2003 due to mental and emotional problems, not back problems.  *Id.* at 506-07. Lenocker's son testified at the hearing and did not describe back problems or any symptoms attributable to degenerative disc disease.  *Id.* at 520-26.

Lenocker experienced a lumbar strain while working at WalMart on May 30, 2003.  *Id.* at 198.  She continued to have back pain at the alleged onset of disability in August 2003, but alleged her primary problem was a psychological crisis brought on by a change in antidepressant medications.  *Id.*  In August 2003, Lenocker reported subjective back pain radiating down her right leg.  *Id.*  Dr. Schieber obtained grossly normal clinical findings, including a negative straight-leg-raise test for radiculopathy.  *Id.* at 195.  Lenocker had mild tension, swelling and tenderness to palpation in the shoulders, neck, and lumbar region of the back.  *Id.*  Dr. Schieber diagnosed a lumbar strain.  *Id.*  Later, Lenocker reported she recovered from this strain and had no persisting symptoms.  *Id.* at 462.

On August 19, 2006, Lenocker threw her back out while working as a care giver assisting an elderly woman. *Id.* at 462, 510-11. Lenocker saw a chiropractor, Michael Miller, D.C., for pain in the lower back, mid back, and neck. *Id.* at 462. Dr. Miller diagnosed an acute lumbosacral sprain. *Id.* On August 23, 2006, Dr. Miller released Lenocker to return to light work with a lifting limitation of 10 pounds. *Id.* at 474. On September 5, 2006, Lenocker told Dr. Miller the spasms in her lower back had decreased in frequency and intensity. *Id.* at 464. Dr. Miller found good functional improvement and referred Lenocker for physical therapy. *Id.* On September 12, 2006, Dr. Miller projected she would be able to return to her job as a caretaker "in 3-6 weeks." *Id.* at 446. He referred Lenocker to a medical doctor for any further treatment the sprain might require. *Id.* There is no record that Lenocker followed through with the referral. At the time of the hearing on November 1, 2006, Lenocker testified she was still off work receiving workers compensation and participating in physical therapy. *Id.* at 511, 517. She was scheduled to complete physical therapy by the end of December 2006. *Id.* at 518.

Radiographic images from August 2006 showed mild lumbar degenerative disc disease. *Id.* at 309. Lenocker argues the ALJ should have attributed her back pain to chronic degenerative disc disease, instead of the discrete lumbar sprains and strains described above.

The ALJ acknowledged Lenocker had "a history of recurrent lumbar strains." *Id.* at 21. He also acknowledged the objective evidence of "mild lumbar degenerative disc disease." *Id.* However, he found no support for ongoing functional limitations that satisfied the duration requirement for disability claims. *Id.*; *see* 20 CFR § 404.1509 (duration requirement defined as "a continuous period of at least 12 months").

The ALJ's conclusion is supported by substantial evidence. Based on the written allegations, testimony, and medical evidence of treatment for back problems, the ALJ could reasonably conclude that Lenocker had episodic acute back pain associated with discrete events and did not suffer from persistent functional impairments related to a chronic condition. The record supports a brief period of back pain in 2003 and a new episode beginning in August 2006. At the time of the hearing, the medical expectation was that her condition would resolve by December 2006. At the time of the decision in April 2007, Lenocker had produced no evidence to refute that expectation or to meet the durational requirement.

The ALJ's conclusion that Lenocker failed to show functional limitations attributable to degenerative disc disease which persisted or were expected to persist for a period of 12 consecutive months was based on reasonable inferences drawn from the record as a whole. Even if the factual record could also support the interpretation Lenocker urges, the court must uphold the Commissioner's rational findings of fact. *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F3d 1190, 1193 (9th Cir 2004); *Andrews v. Shalala,* 53 F3d 1035, 1039-40 (9th Cir 1995); *Morgan v. Comm'r,* 169 F3d 595, 599 (9th Cir 1999).

In summary, any error in failing to designate degenerative disc disease as a severe impairment at step two was harmless because the ALJ resolved step two in Lenocker's favor and considered all the evidence of functional limitations attributable to that medical condition later in the decision. If construed as a challenge to the ALJ's RFC assessment, Lenocker's argument fails because she did not produce evidence of functional limitations which satisfied the duration requirement and were attributable to degenerative disc disease.

///

## II.    **RFC Assessment**

The RFC assessment describes the work-related activities a claimant can do on a sustained, regular, and continuing basis, despite the functional limitations imposed by her impairments.  20 CFR § 404.1545(a); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184.  The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all allegations of limitations and restrictions.  SSR 96-8p, 1996 WL 374184, *5.  Lenocker contends the ALJ improperly rejected the opinions of an examining psychologist (Gregory Cole, PhD), the state agency reviewing psychologists (Frank Lahman, PhD, and Peter LaBray, PhD), and her counselor (Lucinda Lester, LPC).  She also challenges the ALJ's evaluation of her testimony and the statements of her husband and son.

### A.    **Medical Source Statements**

The medical records show Lenocker has a long standing history of depression, general anxiety, panic attacks, and rare suicidal ideation, dating back to at least 1982.  Admin. R. 377-78, 427.  Despite her chronic symptoms, she was able to engage in substantial gainful activity until August 2003.  She was able to resume substantial gainful activity in March 2006 until experiencing a lumbar sprain in August 2006.

At the alleged onset of disability in August 2003, Lenocker told her primary care physician she could not work due to uncontrolled depression which made her feel gloomy and anxious.  *Id.* at 199.  She reported a 10-year history of panic disorder and depression, and attributed her increased depression to a change in one of the antidepressant medications ordered by her former primary care provider.  *Id.*  She continued to take Paxil which reportedly provided good control of her panic symptoms.  *Id.*  Over the ensuing months, Lenocker reported increasing anxiety and panic,

intolerance to driving outside her local area, and fear of crowds and social situations.  She reported temporary improvement with several medication changes, but ultimately continued to feel unable to return to work due to fear of crowds and social places.  *Id.* at 192-95, 198.

In July 2004, Gregory Cole, PhD, performed a psychodiagnostic evaluation.  *Id.* at 207-12. Lenocker stated she could not "work at all because I get really anxious around people for long periods of time." *Id.* at 209.  She also alleged low energy, concentration problems, and inability to drive long distances.  *Id.*  On testing, Lenocker exhibited mild problems with attention and concentration, a tendency to give up easily on tasks, and below average immediate and delayed memory.  *Id.* at 210.  She had overall average intellectual capabilities, however,  and generally was able to sustain simple routine tasks with only mild difficulty completing multi-step tasks.  *Id.* at 210-12.

Dr. Cole diagnosed Major Depressive Disorder, General Anxiety Disorder, and Dependent Personality Disorder.  *Id.* at 211.  He estimated Lenocker's global assessment of functioning ("GAF") at 49, indicating "any serious impairment of social or occupational functioning." *Id.; Diagnostic and Statistical Manual of Mental Disorders* (4th ed 1994) (DSM-IV) 30-32.  Dr. Cole "presumed that her level of fatigue and anxiety would be the primary factors, which would impact her overall level of vocational success."  *Id.* at 211-12.

In July 2004, Frank Lahman, PhD, reviewed the entire record, including Dr. Cole's evaluation, and prepared the standard Psychiatric Review Technique and Mental Residual Functional Capacity forms used to rate the severity of a claimant's mental impairment.  *Id.* at 219-37.  As did Dr. Cole, he found the record supported diagnoses of General Anxiety disorder, Major Depressive disorder, and Dependent Personality disorder.  *Id.* at 222, 224, 226.  He found evidence

of moderate difficulties in activities of daily living, social functioning, and maintaining concentration, persistence, or pace, but no evidence of episodes of decompensation.  *Id.* at 229.

With respect to Lenocker's functional capabilities in specific work-related functions, Dr. Lahman opined that Lenocker was "capable of, and limited to, understanding and remembering short and simple directions and tasks."  *Id*. at 236.  She "would need assistance in order to carry out complex or detailed tasks" and would need to have directions presented "in simple concrete terms." *Id*.  Dr. Lahman found no indication that Lenocker would require constant or special supervision. *Id*.  He further opined that Lenocker "was not able to interact with the general public in extended interactions," but could handle "brief and focused" interactions.  *Id*.  She needed "a routine and predictable" work setting.  *Id*.  In December 2004, Peter LeBray, PhD, again reviewed all the evidence in the case record and affirmed Dr. Lahman's findings.  *Id.* at 219, 236.

In November 2006, Michael Leland, PsyD, performed another psychodiagnositic evaluation of Lenocker, which included a clinical interview, objective testing, and a comprehensive review of records, including her medical records, the evaluation of Dr. Cole, and the progress notes of her counselor, Lucinda Lester.  *Id*. at 475-89.  Dr. Leland had generally normal findings on his mental status evaluation.  *Id*. at 480-81.  Lenocker's mood was mildly anxious, but she did not report or appear to experience any current panic symptoms.  *Id*. at 481.  Dr. Leland noted she appeared to embellish her medical history.  *Id*. at 480.  On testing, Lenocker could understand and carry out basic three-step oral commands and read simple sentences.  *Id*.  Her memory was within functional limits, with some deficit in delayed memory.  *Id.* at 481.

Unlike Dr. Cole, Dr. Leland included validity measures in his evaluation.  Lenocker had scores on four validity scales of the MMPI-II which suggested "severe exaggeration, malingering

or very severe psychopathology." *Id.* at 479.  Dr. Leland indicated the level of psychopathology that would produce these scores would have been readily apparent during the interview, and was not. *Id.* at 484.  Accordingly, it would be reasonable to conclude that Lenocker was malingering or greatly exaggerating her symptoms.

Dr. Leland concluded Lenocker has had chronic anxious and depressive symptoms that have waxed and waned depending on stressors in her life, but have not precluded competitive employment.  *Id.* at 484.  He opined Lenocker's symptoms would continue to wax and wane, but would not preclude a return to her previous occupation.  *Id.*

The ALJ discussed the opinions of Drs. Cole and Lahman and found them both entitled to some weight.  *Id.* at 21, 22, 24.  The ALJ acknowledged that Lenocker experiences limitations from anxiety and depression.  *Id.* at 24.  Ultimately, he adopted the opinion of Dr. Leland and found that Lenocker has mild limitations in the ability to understand, remember, and carry out detailed instructions, to interact appropriately with co-workers, supervisors, and the public, and to respond appropriately to work pressures in a usual work setting.  *Id.* at 24, 25.  Lenocker contends that in adopting Dr. Leland's conclusions, the ALJ improperly rejected parts of both Dr. Cole's and Dr. Lahman's opinions.

An ALJ can reject an examining physician's opinion in favor of the conflicting opinion of another examining physician, if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record."  *Thomas v. Barnhart*, 278 F3d 947, 956-57 (9th Cir 2002), quoting *Magallanes v. Bowen*, 881 F2d 747, 751 (9th Cir 1989).  The decision makes clear that the ALJ found Dr. Leland's evaluation the latest, most comprehensive, and most consistent with the record as a whole.  Admin. R. 22-25.

9 - FINDINGS AND RECOMMENDATION

Lenocker relies primarily on Dr. Cole's GAF of 49, indicating serious impairment in social and occupational functioning.  However, Dr. Cole did not identify deficits in specific work-related activities.  Unlike Dr. Cole, Dr. Leland focused his findings on specific work-related activities instead and found only slight impairment in Lenocker's ability to interact appropriately with coworkers, supervisors, and the public.  *Id.* at 488.  This was consistent with Lenocker's report to Dr. Cole that she "got along with her coworkers and supervisors" when working.  *Id.* at 208. Dr. Leland found Lenocker's ability to understand, remember and carry out instructions unimpaired, except for slight impairment with regard to detailed instructions.  *Id.* at 487.  This was generally consistent with Dr. Cole's opinion that she retained the ability to sustain simple routine tasks and had only mild difficulty with multiple-step tasks.  *Id.* at 211.

The ALJ also noted Dr. Cole's severe GAF was not supported by his relatively benign mental status findings.  *Id.* at 21.  He did not identify anything on mental status evaluation that would suggest a severe deficit in global functioning.  Dr. Cole found Lenocker "overall exhibited average intellectual capabilities."  *Id.* at 210.  She exhibited only mild problems with attention and concentration and could do simple arithmetic computations, spelling, and reading.  *Id.*  The inconsistency between Dr. Cole's relatively benign examination findings and his relatively severe assessment of Lenocker's global functioning support the ALJ's decision to give greater weight to Dr. Leland's opinion.

Lenocker contends the ALJ improperly rejected part of Dr. Lahman's assessment, in which he opined Lenocker should not interact with the general public in extended interactions.  *Id.* at 236. Instead, the ALJ adopted Dr. Leland's opinion that Lenocker has only slight limitations in her ability to interact appropriately with the public.  *Id.* at 25, 488.

The Commissioner relies on medical and psychological consultants to make findings of fact about the nature of a claimant's impairments and the severity of the functional limitations they impose. 20 CFR § 404.1527(f); SSR 96-6p, 1996 WL 374180. Such reviewing sources do not treat or examine the claimant. Therefore, their opinions are held to stricter standards and given weight only to the extent they are supported by the record and consistent with the record as a whole. SSR 96-6p. The ALJ is not bound by the findings of reviewing consultants, but may not ignore their opinions and must explain the weight given to the opinions in their decision. *Id.*

The ALJ found Dr. Leland's opinion "generally consistent" with Dr. Lahman's, but favored Dr. Leland's where they differed regarding Lenocker's ability to interact with the public. This is reasonable because Dr. Leland had the benefit of two years of additional treatment records after Dr. Lahman's assessment, as well as additional objective testing which revealed malingering or severe exaggeration in Lenocker's subjective reports. The ALJ cited this in finding that Lenocker's subjective reporting of symptoms, including her allegations of problems interacting with the public, could not be taken at face value. *Id.* at 25.

It is the ALJ's responsibility to resolve conflicts in the medical evidence. *Carmickle v. Comm'r, Soc. Sec. Admin.,* 533 F3d 1155, 1164 (9th Cir 2008). The ALJ reasonably chose to adopt the opinion of Dr. Leland, which was the most recent, based on the most comprehensive information, and most consistent with the record as a whole. The ALJ's explanation for adopting Dr. Leland's opinion instead of Dr. Cole's or Dr. Lahman's was reasonable and adequate.

The court must uphold the ALJ's factual findings if they are supported by inferences reasonably drawn from the record and if evidence exists to support more than one rational interpretation, the court must defer to the Commissioner's decision. *Tommasetti v. Astrue,* 533 F3d

1035, 1038 (9th Cir 2008).  The ALJ rationally resolved the conflicting medical evidence and his

evaluation should not be disturbed.

### B.    Credibility Determination

Lenocker alleged disability beginning August 9, 2003, due to severe depression, panic

attacks, forgetfulness, exhaustion, and inability to tolerate stress or crowds for very long.  Admin.

R. 97, 106, 122-23.  In her disability reports, Lenocker indicated that driving and social activities

trigger anxiety attacks.  *Id.* at 144, 146, 168.  Going more than 13 blocks away from her house

triggers a panic attack.  *Id.* at 153.  Lenocker stated she has "severe short term memory loss" making

tasks requiring attention difficult.  *Id.* at 179.  She needs to be reminded to get dressed and take her

medications and sometimes forgets to turn off the burners on the stove.  *Id.* at 167.  She can

concentrate for two hours and follow written instructions, but has difficulty remembering spoken

instructions.  *Id.* at 170.  Lenocker does some household chores, such as folding clothes and washing

dishes, but lacks the endurance to complete housework.  *Id.* at 144, 165, 167.  She can walk half a

block before needing to rest for five to 10 minutes.  *Id.* at 170.

Lenocker testified that she began to have problems with anxiety and panic while working

as a shelf stocker in a grocery store in 2001 and left that job because it was too stressful.  *Id.* at 503-

04.  She then worked as a cashier in 2002 and 2003 until she had a "total breakdown" in August

2003 after discontinuing an antidepressant medication.  *Id.* at 504.  This left her unable to think or

concentrate.  *Id.* at 505.  She was "totally bedridden" and lost all hope.  *Id.* at 504-05.  She tried a

number of medications but could not get back on her feet emotionally or mentally.  *Id.* at 505-07.

For two and a half years she could not function or remember anything, and she was housebound

because she was afraid to go anywhere by herself.  *Id.* at 507.

Lenocker tried to work again in March 2006, when she was hired to take care of an elderly woman. *Id*. at 508. Her duties included housework and making sure the client took her medications and ate. *Id*. Lenocker worked there until early August 2006, when the woman's family let her go due to lack of funds. *Id.* at 509. She was then placed with a different elderly woman who required assistance ambulating. *Id*. at 510. Lenocker sprained her back while supporting the woman's weight. *Id.* She was cleared to return to work with a 20 pound lifting limitation. *Id*. at 511. She has not returned because caring for elderly people sometimes requires supporting the client's body weight and involves more than 20 pounds. *Id.*

The ALJ acknowledged that Lenocker "experiences some limitations resulting from symptoms of anxiety and depression." *Id*. at 24. He accepted that Lenocker "has a mild limitation in her ability to understand, remember, and carry out detailed instructions, interact appropriately with co-workers, supervisors, and the public, and respond appropriately to work pressures in a usual work setting." *Id*. at 25. The ALJ did not accept Lenocker's assertions of functional limitations in excess of the foregoing RFC assessment. He found "her statements concerning the intensity, duration, and limiting effects of her symptoms are not entirely credible." *Id.* at 24. Specifically, he rejected Lenocker's assertions of exertional limitations and limitations in the ability to understand, remember, and carry out short, simple instructions, make judgments on simple work-related decisions, and respond appropriately to changes in a routine work setting. *Id.* at 22.

In deciding whether to accept subjective statements, an ALJ must perform two stages of analysis. The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms

alleged. *Smolen v. Chater*, 80 F3d 1273, 1281-82 (9th Cir 1996); *Cotton v. Bowen*, 799 F2d 1403,

1407-08 (9th Cir 1986). There is no dispute about the first stage in this case.

At the second stage, an ALJ may discredit a claimant's testimony regarding the severity of

symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F3d 915,

918 (9th Cir 1993); *Smolen*, 80 F3d at 1283. An ALJ may consider objective medical evidence, the

claimant's treatment history, daily activities, and work record, and the observations of treating

sources and third parties with personal knowledge of the claimant's functional limitations. *Smolen*,

80 F3d at 1284; SSR 96-7p, 1996 WL 374186. The ALJ must make findings that are "sufficiently

specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the

claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995).

The ALJ considered these factors in evaluating Lenocker's credibility. The ALJ found it

significant that Dr. Leland's formal testing revealed compelling evidence of malingering or severe

exaggeration in Lenocker's subjective reporting. Admin. R. 25, 479, 484. As a result, the ALJ

concluded Lenocker's testimony and self-reporting of symptoms "cannot be taken at face value."

*Id.* at 25; *see Tonapetyan v. Halter,* 242F3d 1144, 1148 (9th Cir 2001) (evidence of a tendency to

exaggerate is a proper factor to consider in making credibility determination).

The ALJ considered Lenocker's work history. Lenocker alleged a long history of chronic

depression and anxiety dating back at least 10 years. Despite these impairments, Lenocker had

engaged in substantial gainful activity during the same period. The record shows Lenocker was able

to work and control her symptoms with medication until August 2003. Nothing in the record

explains why her controlled chronic condition became uncontrollable at that time, other than

possibly a change in medications. Admin. R. 198-99. The ALJ also relied on Lenocker's

demonstrated ability to work at substantial gainful activity as a care giver from March 2006 until August 2006. *Id*. at 24, 509. She did not report any problem with her allegedly disabling mental impairments while performing this work and reportedly stopped that work due to a lumbar strain, not because of her allegedly disabling mental impairments. The ALJ could reasonably draw an adverse inference as to credibility from this work history. *See Bruton v. Massanari*, 268 F3d 824, 828 (9th Cir 2001) (ALJ can draw adverse inference from evidence the claimant stopped working for reasons other than allegedly disabling medical condition).

The ALJ also drew an adverse inference as to credibility from inconsistencies in Lenocker's statements over time. For example, Lenocker testified that she was unable to function at all, "totally bedridden" and "pretty much housebound" from the alleged onset of disability in August 2003 until she started working again in March 2006. *Id.* at 504-07. The ALJ found this inconsistent with Lenocker's contemporaneous reports to Dr. Cole in July 2004 that she could get out of the house, drive a car, perform household chores, and maintain personal hygiene. *Id.* at 25, 209, 210-11.

The ALJ noted that Lenocker failed to follow through with treatment recommendations for counseling in August 2003, when she claimed to be experiencing a complete breakdown. When a claimant makes subjective statements about disabling symptoms, but fails to comply with recommended treatment intended to alleviate the symptoms, an ALJ may reasonably find the subjective statements unjustified or exaggerated. *Orn v. Astrue,* 495 F3d 625, 638 (9th Cir 2007) (failure to seek and follow treatment despite claims of debilitating symptoms is a sufficient reason to disregard subjective testimony about the symptoms).

In deciding whether to accept Lenocker's subjective statements, the ALJ considered appropriate factors and reached conclusions that are supported by substantial evidence in the record.

The findings are sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit Lenocker's testimony. *Orteza,* 50 F3d at 750. Even if the record supports another interpretation of the evidence more favorable to Lenocker's claim, the court cannot disturb the Commissioner's rational findings of fact. *Tommasetti,* 533 F3d at 1038. Accordingly, the ALJ's credibility determination should not be disturbed.

### C.     Lay Witness Statements

Lenocker's husband and son provided written statements and her son testified at the hearing. Admin. R. 133-41, 156-64, 187, 520-28. They indicated that Lenocker had limited ability to independently complete tasks in personal care, preparing meals, and performing house and yard work. They stated she cannot drive or leave home alone, and needs assistance with most household tasks. She has difficulty remembering and understanding. She has panic attacks which include migraine headaches, body aches, fatigue, suicidal ideas, and loss of appetite. She stays in bed for days when she has a panic attack. Lenocker's son testified that she can work for one or two days, but after that she will exhibit symptoms of a panic attack, including dizziness, vomiting, diarrhea, and headache. *Id.* at 187, 526.

Family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill,* 12 F3d at 918. Such testimony cannot be disregarded without comment. *Nguyen v. Chater,* 100 F3d 1462, 1467 (9th Cir 1996). While the ALJ must take into account lay witness testimony about a claimant's symptoms, the ALJ may discount that testimony by providing reasons that are germane to the witness. *Carmickle,* 533 F3d at 1164.

The ALJ found the lay witness statements described observations of Lenocker during intermittent episodes of diminished capacity and did not describe her generally prevailing level of function.  Admin. R. 26.  He based this conclusion on the medical evidence and opinions that Lenocker suffers from waxing and waning symptoms.  He also relied on Lenocker's work history which showed the ability to maintain substantial gainful activity despite her chronic symptoms.  Conflict with medical evidence and other evidence in the record is a proper reason to discount lay witness statements.  *See* 20 CFR § 404.1529(c)(3).  It was not error for the ALJ to rely on other credible evidence he found more persuasive.  *Greger v. Barnhart,* 464 F3d 968, 972 (9th Cir 2006); *Lewis v. Apfel,* 236 F3d 503, 511-12 (9th Cir 2001).

Lenocker also contends the ALJ improperly rejected the opinion of her counselor, Lucinda Lester, LPC.  Lester responded to a November 2004 request for records with an undated letter stating that Lenocker had a diagnosis of Panic Disorder affecting "her ability to socially interact, adapt, and sustain concentration."  Admin. R. 218.  Lester indicated she had only seen Lenocker a few times since May 2004.  *Id*.  As of November 2004, Lester reported that Lenocker's depression had stabilized on medication, and she had learned skills for coping with panic symptoms.  *Id*. at 215-17.  She had improved in appearance and shown progress in coping skills, but remained in need of medication and further therapy.  *Id*.  Public and social situations disturbed Lenocker and triggered panic attacks, and she "decompensates in situations that have crowds, driving, social interactions."  *Id.* at 216-17.

In August 2006, Lester prepared a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form.  *Id.* at 291-308.  Lester opined that Lenocker met the diagnostic criteria for Panic Disorder.  *Id.* at 300.  She rated Lenocker's degree of limitation in

all four major categories of function as "Extreme" for the period from December 2004 to March 2006, and "Moderate" for the period from March 2006 until August 2006. *Id.* at 305. Lester rated her functional ability on all 20 work-related functions comprising the Mental Residual Functional Capacity Assessment form "Markedly Limited" for the earlier period and "Moderately Limited" for most of those categories for the later period. *Id.* at 291-92. Lester estimated Lenocker's GAF at the beginning of therapy at 25. *Id.* at 294. A GAF of 25 is used to indicate considerable influence from hallucinations or delusions, serious impairment in communication or judgment manifested by grossly inappropriate behavior or incoherence, or an inability to function in almost all areas. DSM-IV, 30-32.

The ALJ gave "little weight" to Lester's reports and opinion. Admin. R. 25. He noted that Lester used check-the-box forms without identifying clinical or objective findings to support her conclusions. *Id.* An ALJ can reject opinions that are conclusory and unsupported by clinical findings. *Meanal v. Apfel*, 172 F3d 1111, 1117 (9th Cir 1999). In the absence of supporting findings based on clinical observations, the ALJ could reasonably believe Lester premised her opinion primarily on Lenocker's subjective reports, which the ALJ properly found unreliable. *Tonapetyan,* 242 F3d at 1149 (ALJ was entitled to reject opinion premised primarily on subjective complaints the ALJ properly found unreliable).

The ALJ gave greater weight to Dr. Leland's opinion because of his training and expertise and because he supported his opinion with findings based on clinical observations, objective testing, and a comprehensive review of Lenocker's treatment records. Admin. R. 26. Lenocker argues Lester was better able to assess her longitudinal functioning based on her two-year counseling relationship because Dr. Leland examined her once. However, Dr. Leland reviewed Lenocker's records back to

1982, and was able to consider Lester's reports in reaching his opinion. On the other hand, Lester was not aware of Dr. Leland's test results showing Lenocker's subjective reports could not be taken at face value. The ALJ's conclusion that Dr. Leland's opinion was entitled to greater weight than Lester's report was not irrational.

Lenocker argues the ALJ's other reasons appear to be based on confusion by the ALJ about the timing or degree of improvement Lester found in Lenocker's functioning. The ALJ thought it was internally inconsistent that Lester found Lenocker had improved in November 2004, yet found her "extremely limited" until 2006. *Id*. at 25. However, Lester could have meant that Lenocker had improved slightly in 2004 but remained extremely limited until 2006. The ALJ found Lenocker's ability to work as a care giver from March to August 2006 inconsistent with Lester's opinion that Lenocker remained extremely limited until August 2006. *Id*. at 26. However, Lester's opinion can be read to indicate that Lenocker's improvement occurred when she returned to work. Even if this argument is sustained, and the ALJ was confused on these points, it would not overcome the ALJ's other reasons for giving greater weight to Dr. Leland's opinion.

Finally, Lenocker challenges the ALJ's assertion that Lester's GAF of 25 clearly overstated her functional limitations. Lenocker argues the GAF of 25 was consistent with the functional limitations she was reporting in March 2004. The ALJ could reasonably find it was not consistent with the activities she reported to Dr. Cole in July 2004 or on her written questionnaires.

The ALJ did not disregard Lester's reports without comment. He considered her statements in context with the record as a whole and gave germane reasons for discounting her opinion in favor of Dr. Leland's. Accordingly, the ALJ determination should not be disturbed. *Nguyen,* 100 F3d at 1467; *Carmickle,* 533 F3d at 1164; *Greger,* 464 F3d at 972; *Lewis,* 236 F3d at 511-12.

///

///

### III.    <u>Vocational Evidence</u>

Lenocker challenges the vocational evidence on two grounds.  First, she contends the ALJ elicited vocational testimony from the VE with a hypothetical question that did not contain all of her limitations and restrictions.  She contends the ALJ should have included additional limitations based on alleged errors in the ALJ's RFC assessment.  Her arguments in support of those errors cannot be sustained for reasons discussed previously in this opinion.  The ALJ considered all the evidence and framed his vocational hypothetical question based on the limitations supported by the record as a whole.  The hypothetical limitations reflected reasonable conclusions that could be drawn from the record.  An ALJ is not required to incorporate limitations based on evidence that he properly discounted.  *Osenbrock v. Apfel,* 240 F3d 1157, 1164-65 (9th Cir 2001).

Second, Lenocker contends the ALJ failed to determine whether the VE's testimony was consistent with the information in the Department of Labor publication *Dictionary of Occupational Titles* ("DOT").  When the ALJ relies on VE testimony for information about the requirements of an occupation, the ALJ has an affirmative responsibility to ask about any possible conflict between the VE's testimony and information provided in the DOT.  SSR 00-4p, 2000 WL 1898704; *Massachi v. Astrue,* 486 F3d 1149, 1152 (9th Cir 2007).  If the VE's testimony deviates from the DOT, then the ALJ must provide a reasonable explanation for the deviation before relying on the VE's testimony. *Johnson v. Shalala,* 60 F3d 1428, 1435 (9th Cir 1995).

The procedural requirements of SSR 00-4p ensure that the record is clear as to why an ALJ relied on VE testimony that conflicts with the information in the DOT.  In this case, the ALJ did not

fulfill his responsibility to inquire whether there was such conflict. That procedural error is harmless, however, because Lenocker has not identified a potential conflict or apparent deviation by the VE from the information in the DOT. *Massachi,* 486 F3d at 1154 n19.

Lenocker's contention that the Commissioner's determination was based on improper vocational testimony cannot be sustained.

## RECOMMENDATION

The ALJ applied proper legal standards and his findings are supported by substantial evidence in the record as a whole. Thus, the Commissioner's final decision should be AFFIRMED.

## SCHEDULING ORDER

Objections to the Findings and Recommendation, if any, are due March 6, 2009. If no objections are filed, then the Findings and Recommendation will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will be referred to a district judge and go under advisement.

DATED this 17th day of February, 2009.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

21 - FINDINGS AND RECOMMENDATION